# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ROSE MARIE RICH and ANDREW BOUCHARD, On Behalf of Themselves and All Others Similarly Situated, | : | Civil Action No. _____ |
| | : | |
| | : | |
| Plaintiffs, | : | **CLASS ACTION COMPLAINT** |
| | : | |
| vs. | : | <u>JURY TRIAL DEMANDED</u> |
| | : | |
| EXPEDIA, INC., HOTELS.COM L.P., PRICELINE.COM INC., TRAVELWEB LLC, BOOKING.COM B.V., BOOKING.COM (USA), INC., ORBITZ WORLDWIDE INC., SABRE HOLDINGS CORPORATION, TRAVELOCITY.COM L.P., HILTON WORLDWIDE, INC., HYATT HOTELS CORPORATION, INTERCONTINENTAL HOTELS GROUP RESOURCES, INC., KIMPTON HOTEL & RESTAURANT GROUP, LLC, MARRIOTT INTERNATIONAL, INC., STARWOOD HOTELS & RESORTS WORLDWIDE, INC., TRUMP INTERNATIONAL HOTELS MANAGEMENT, LLC, and WYNDHAM WORLDWIDE CORPORATION, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

Plaintiffs, Rose Marie Rich and Andrew Bouchard ("Plaintiffs"), by and through their attorneys, on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Expedia, Inc., Hotels.com L.P., Priceline.com Inc., Travelweb LLC, Incorporated, Booking.com B.V., Booking.com (USA), Inc., Orbitz Worldwide, Inc., Sabre Holdings Corporation, Travelocity.com L.P., Hilton Worldwide, Inc., Hyatt Hotel Corporation, InterContinental Hotels Group Resources Inc., Kimpton Hotel & Restaurant Group, LLC, Marriott International, Inc., Starwood Hotels & Resorts Worldwide, Inc., Trump International Hotels Management, LLC, and Wyndham Worldwide Corporation (collectively, "Defendants"), and allege, based upon personal knowledge as to their own acts, and as to all other matters, upon information and belief, as follows:

NATURE OF ACTION

1.      This action seeks damages and equitable relief from Defendants under Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, for price fixing online hotel room reservations in the United States.  Defendants are (1) the four dominant online travel agencies in the United States and (2) major hotel chains in the United States.  Plaintiffs and the Class purchased hotel room reservations online directly from Defendants.  As alleged herein, Defendants conspired with each other in violation of the Sherman Act to artificially inflate the prices paid by Plaintiffs for Defendants' hotel rooms booked online in the United States.

PARTIES

Plaintiffs

2.      Rose Marie Rich is a citizen of Fullerton, California.  In July 2012, Ms. Rich purchased an online room reservation at the Hilton Union Square in San Francisco, California through Travelocity.com.  Ms. Rich has been damaged by the conduct alleged herein.

3.      Andrew Bouchard is a citizen of Reno, Nevada.  Between March 2011 and August 2012, Mr. Bouchard purchased numerous online room reservations at hotels across the country through Priceline.com.  Mr. Bouchard has been damaged by the conduct alleged herein.

OTA Defendants

4.    Defendants Expedia, Inc., Hotels.com L.P., Priceline.com Inc., Travelweb LLC, Booking.com B.V., Booking.com (USA), Inc., Orbitz Worldwide, Inc., Sabre Holdings Corporation, Travelocity.com L.P. are each online travel agencies ("OTAs") and collectively are referred to herein as the "OTA Defendants."

*Expedia*

5.    Defendant Expedia, Inc. ("Expedia") is a Delaware corporation with its principal place of business at 333 108th Avenue NE, Bellevue, Washington 98004.  Expedia is the world's largest OTA, controlling about 140 different travel related websites, including Expedia.com, Hotels.com, and Hotwire.com.  Expedia generates a majority of its revenue from the marketing and distribution of hotel rooms.

6.    Defendant Hotels.com L.P. ("Hotels.com") is a Texas limited partnership with its headquarters located at 10440 North Central Expressway, Suite 400, Dallas, Texas 75231. Hotels.com is an OTA that is controlled by its corporate parent Expedia, Inc.

*Priceline.com*

7.    Defendant Priceline.com Inc. ("Priceline") is a Delaware corporation with its primary place of business located at 800 Connecticut Avenue, Norwalk, Connecticut 06854. Priceline is a leading OTA, operating such websites as priceline.com, booking.com, lowestfare.com, and travelweb.com.

8.    Defendant Travelweb LLC ("Travelweb") is a Delaware limited liability company with its principal place of business located at 2777 North Stemmons Fwy., Ste. 675, Dallas, Texas 75207.  Travelweb was founded as an online hotel distributor by Hilton Hotels Corporation, Hyatt Corporation, Marriott International, Inc., a predecessor of InterContinental Hotels Group, Starwood Hotels and travel technology provider Pegasus Solutions, Inc. in February 2002.  In March 2003, Priceline entered into an agreement with Travelweb to gain access to Travelweb's hotel inventory and also purchase an approximately 10% equity stake in

Travelweb.   During 2004, Priceline purchased the remaining equity in Travelweb, such that Travelweb has been a wholly-owned subsidiary of Priceline since December 2004.

9.      Defendant Booking.com B.V. is a Netherlands company with its principal place of business at Rembrandt Square Office, Herengracht 597, 1017 CE Amsterdam, Netherlands. Booking.com B.V. operates Booking.com, the leading worldwide online hotel reservations agency by room nights sold, attracting over 30 million unique visitors each month via the internet from both leisure and business markets worldwide.   Booking.com B.V. is a wholly-owned subsidiary of Defendant Priceline.

10.      Defendant Booking.com (USA) Inc. is a Delaware corporation with its primary place of business located at 100 William Street, Suite 750, New York, New York 10038. Booking.com (USA), Inc. is a wholly owned subsidiary of Priceline.

*Orbitz*

11.      Defendant Orbitz Worldwide, Inc. ("Orbitz") is a Delaware corporation with its principal place of business located at 500 W. Madison Street, Suite 1000, Chicago, Illinois 60661.   Orbitz is a leading online travel company founded by a group of airlines in early 2000. In November 2004, Orbitz was acquired by Cendant Corporation, which is the predecessor company to Defendant Wyndham.   In 2006, Orbitz was spun out of Cendant Corporation and eventually taken public in 2007 as Orbitz Worldwide, Inc.   Among the OTAs controlled by Orbitz are Travel Networks, Inc. (d/b/a CheapTickets), HotelClub, and eBookers.

*Travelocity*

12.      Defendant Sabre Holding Corporation ("Sabre"), incorporated in Delaware, is headquartered at 3150 Sabre Drive, Southlake, Texas 76092.   Defendant Sabre owns and operates Defendant Travelocity.com.

13.      Defendant Travelocity.com L.P. ("Travelocity") is a Delaware limited partnership with its principal place of business located at 3150 Sabre Drive, Southlake, Texas 76092. Travelocity is owned by Defendant Sabre.

4

Hotel Defendants

14.    Defendant Hilton Worldwide, Inc. ("Hilton") is a Delaware company doing business as Hilton Hotels & Resorts with its principal place of business located at 7930 Jones Branch Drive, McLean, Virginia 22102.  Hilton owns, operates, or manages hotels in the United States whose room reservations are available online through the Defendant OTAs.  Hilton operates hotels under the brand names: Waldorf Astoria Hotels & Resorts, Conrad Hotels & Resorts, Hilton, Doubletree, Embassy Suites, Hilton Garden Inn, Hampton, and Homewood Suites, among others.

15.    Defendant Hyatt Hotels Corporation ("Hyatt") is a Delaware corporation with its principal place of business located at 71 South Wacker, 12th Floor, Chicago, Illinois 60606. Hyatt owns, operates, or manages hotels in the United States whose room reservations are available online through the Defendant OTAs.  Hyatt operates hotels under the brand names: Andaz, Grand Hyatt, Park Hyatt, Hyatt Hotels, Hyatt Regency, and Hyatt Resorts, among others.

16.    Defendant InterContinental Hotels Group Resources, Inc. ("InterContinental") is a Delaware corporation with its principal place of business located at 3 Ravinia Drive, Suite 100, Atlanta, Georgia 30346.  InterContinental owns, operates, or manages hotels in the United States whose room reservations are available online through the Defendant OTAs.  InterContinental operates hotels under the brand names: InterContinental Hotels and Resorts, Hotel Indigo, Crowne Plaza, Holiday Inn, Holiday Inn Express, Staybridge Suites, and Candlewood Suites among others.  Defendant InterContinental, along with Defendants Hilton, Wyndham, Hyatt, and Marriot, operates an OTA called Roomkey.com.

17.    Defendant Kimpton Hotel & Restaurant Group, LLC ("Kimpton") is a Delaware limited liability company with its principal place of business located at 222 Kearney Street, Suite 200, San Francisco, California 94108.  Kimpton owns, operates, or manages hotels in the United States whose room reservations are available online through the Defendant OTAs.  Kimpton operates approximately 59 hotels in the United States and is the largest chain of boutique hotels

in the United States.  Kimpton operates hotels under the brand names Hotel Monaco and Hotel Palomar, among others.

18.    Defendant Marriott International, Inc. ("Marriott") is a Delaware corporation with its principal place of business located at 10400 Fernwood Road, Bethesda, Maryland 20817-1102.  Marriot owns, operates, or manages hotels in the United States whose room reservations are available online through the Defendant OTAs.  Marriot operates hotels under the brand names: Marriot, Ritz-Carlton, Courtyard, Fairfield, and Residence Inn, among others.

19.    Defendant Starwood Hotels & Resorts Worldwide, Inc. ("Starwood") is a Maryland corporation with its principal place of business located at One StarPoint, Stamford, Connecticut 06902.  Starwood owns, operates, or manages hotels in the United States whose room reservations are available online through the Defendant OTAs.  Starwood operates hotels under the brand names: St. Regis, The Luxury Collection, Sheraton, Westin, W, Le Meridien, Four Points by Sheraton, Aloft and Element, among others.

20.    Defendant Trump International Hotels Management, LLC, doing business as The Trump Hotel Collection ("Trump") is a Delaware limited liability company headquartered at 725 Fifth Avenue, New York, New York 10022.  Trump owns, operates, or manages hotels in the United States whose room reservations are available online through the Defendant OTAs. Trump operates hotels under the Trump brand name in locations such as New York City, Las Vegas, and Chicago.

21.    Defendant Wyndham Worldwide ("Wyndham") is a Delaware corporation headquartered in 22 Sylvan Way, Parsippany, New Jersey 07054.  Wyndham owns, operates, or manages hotels in the United States whose room reservations are available online through the Defendant OTAs.  In July 2006, Wyndham was spun out of Cendant Corporation.  Wyndham operates hotels under the brand names: Wyndam, Microtel Inn & Suites, Planet Hollywood, Ramada, Baymont, Days Inn, Super 8, Howard Johnson, Travelodge, and Knights Inn, among others.

22.     Defendants Hilton Worldwide, Inc., Hyatt Hotel Corporation, InterContinental Hotels Group Resources Inc., Kimpton Hotel & Restaurant Group, LLC, Marriott International, Inc., Starwood Hotels & Resorts Worldwide, Inc., Trump International Hotels Management, LLC, and Wyndham Worldwide Corporation are referred to herein as the "Hotel Defendants."

## AGENTS AND CO-CONSPIRATORS

23.     Whenever this complaint refers to an act of an entity, such as a corporation or partnership, the complaint is alleging that the entity engaged in the act by or through its directors, partners, managers, officers, employees, agents, or other representatives while they were actively engaged in the management of the entity.

24.     Other persons not named as Defendants in this complaint have participated as co-conspirators with Defendants, performing acts in furtherance of the conspiracy.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as Defendants in this complaint.

25.     At all times herein mentioned, each and every Defendant and co-conspirator was an agent of each and every other Defendant and co-conspirator.  Each of the Defendants aided and abetted the commission of unlawful business practices of their co-conspirators and was aware, or should have been aware, that the agreements to artificially inflate prices assisted and/or encouraged their co-conspirators in the commission of the unlawful and anticompetitive acts alleged herein.

## JURISDICTION AND VENUE

26.     This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, for damages and to secure injunctive relief against Defendants for violations of §1 of the Sherman Act, 15 U.S.C. §1, as alleged herein.

27.     Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§1331 and by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

28.     This Court has personal jurisdiction over each Defendant because each was engaged in an illegal scheme directed at and with the intended effect of causing injury to persons and entities residing in, located in, or doing business throughout the United States.

29.     Venue is proper in this District pursuant to §§12 and 16 of the Clayton Act, 15 U.S.C. §§22 and 26, and 28 U.S.C. §1391(b)-(d).  First, Defendants Priceline and Starwood are headquartered in this District and took actions in furtherance of the unlawful conspiracy in this District.  Second, other Defendants also resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described herein has been carried out, in this District.

<u>FACTUAL ALLEGATIONS</u>

<u>The Market</u>

30.     Hotels and lodgings are recognized as a distinct segment of the U.S travel market. The hotels and lodging segment is further divided in the U.S. between (1) leisure/unmanaged business travel and (2) managed business travel.  The leisure/unmanaged business travel market represents pleasure trips and business trips that are not managed under corporate policies or booked through a travel management company under contract with a business.  Managed business travel represents business trips booked through a travel management company. Leisure/unmanaged business travel and managed business travel are recognized as distinct product markets.  Recognizing the distinction between these product markets, Expedia reports its revenues for Engencia, its managed business travel operation, separately from its revenue for its leisure operations.  *See* Expedia 2011 Annual Report at 52.

31.     The Hotel Defendants distribute room reservations for leisure/unmanaged business travel through four channels, including two offline channels and two online channels. The offline channels consist of (1) the hotel's central reservation (phone system) along with walk-in reservations and (2) traditional travel agencies.  The online channels of distribution

consist of the hotel's websites and the websites of OTAs.  Through the years, online distribution of hotel room reservations has increased at the expense of offline channels.

32.    According to PhoCusWright, a leading source for data, information, and analysis in the travel, tourism, and hospitality industry, hotel and OTA websites constitute the U.S. online leisure/unmanaged business travel market for room reservations.[1]  Online booking for hotels in the U.S. has distinct features that consumers demand.  For example, OTA websites allow consumers to search online for hotel prices and availability across multiple hotels simultaneously.  This cannot be done by telephoning a single hotel.  Furthermore, in 2010, for consumers who booked leisure travel, 54% either usually used or exclusively used online booking.  Another 28% used some online sources.

33.    The U.S. online leisure/unmanaged business travel market for room reservations is estimated to be $36 billion in gross bookings in 2012.  The Hotel Defendants provide over 70% of the room reservations to this market.  The OTA Defendants control nearly 45% of the gross bookings in this market.  Collectively, the OTA Defendants and Hotel Defendants dominate the U.S. online leisure/unmanaged business travel market for room reservations.

The OTAs

34.    OTAs operate websites that allow their customers to make travel plans and book reservations, including hotel room reservations, over the internet.

35.    With the widespread use of the internet, OTAs emerged as major participants in the U.S. travel market during the 1990s.  From the early 2000s continuing to the present, the OTA Defendants have been the dominant OTAs as measured in terms of market share and gross bookings, having acquired and/or consolidated all their various competitors.  For example, in addition to its flagship website, expedia.com, Defendant Expedia operates up to 140 other travel-related websites.

---

[1]    PhoCusWright's research and data is often quoted by Defendants in their public filings with the SEC.  *See, e.g.,* Expedia 2011 Annual Report at 3, 33; Orbitz 2011 Annual Report at 10.

36.     The OTA Defendants operate using two main business models: (1) the "agency model" and (2) the "merchant model."  The OTA Defendants can choose which model they use, and some, such as Defendant Priceline, use both.  Defendants admit that their business models and practices operate on a national level and do not vary from city to city.

37.     Through the 1990s and into the early 2000s, the OTA Defendants primarily conducted bookings for online room reservations through the agency model.

38.     In the agency model, the OTA Defendant acts as a traditional travel agent, facilitating reservations on behalf of the hotel and simply passing that reservation on to the hotel.  The OTA Defendant receives a commission as an agent.  Under the agency model, the retail price of the hotel room is determined by the hotel.

39.     Because the retail price for the room reservation was determined by the hotel, the OTA Defendants did not have to compete on price for room reservations either against each other or against the hotel.

40.     The OTA Defendants also operate under the merchant model.  The pervasive use of the merchant model started in the early 2000s.  Expedia shifted to the merchant model in 2000.  Travelocity instituted its merchant model in 2002.  Orbitz launched its merchant model in March 2003.  Priceline began using the merchant model in 2002.

41.     Under the merchant model, the OTA Defendants do not function merely as agents for the hotels.  Instead, the OTA Defendants enter into contracts with hotels to acquire, at a wholesale or a net rate, an inventory of hotel rooms.  The OTA Defendants then sell that inventory of room reservations to resell the rooms to consumers at a higher, retail rate.

42.     Under the merchant model, the OTA Defendants – not the hotels – set the retail rate they will charge consumers for the online room reservation.

43.     Travelocity has described the differences between the agency and merchant models as follows:

> [Under the agency model], Travelocity is the middle man and has
> no control in either the rate being offered to the customer or the
> commission paid to us by the hotels.

10

> [Under the merchant model], Travelocity negotiates with hotels for rooms on a net basis. This means we pay the hotel a flat rate for each room sold. We then have control over the price we offer to the customer and, therefore control the profit we make from the market.

44.     Expedia explained that under the merchant model its suppliers make inventory available to Expedia at wholesale or net rates. Expedia then determines the retail price that the customer pays and processes the transactions by buying the inventory and selling it to the customer.

45.     The merchant model is regarded as much more profitable than the agency model for the OTA Defendants. For example, in its Annual Report for the fiscal year ended December 31, 2011, Priceline reported for 2011 gross bookings of about $17.6 billion and $4 billion for its agency and merchant models, respectively.[2] Despite the large difference between its gross bookings for its agency model and merchant model, Priceline reported similar actual revenue from each model. For 2011, it reported revenue from its agency model of about $2.3 billion and revenue from its merchant model was about $2 billion

The Conspiracy Is Implemented Through a Series of Materially Similar Price Restraints

46.     Because under the merchant model (1) the OTA Defendants can control the retail price for online room and (2) there are substantial profit margins, there exists the capacity for substantial price competition by OTA Defendants between themselves and against the Hotel Defendants.

47.     The OTA Defendants and the Hotel Defendants structured their contracts between themselves to avoid costly price competition. The contracts between the OTA Defendants and the Hotel Defendants all contain parity and "most favored nation" clauses. The parity clauses insure that no one charges less than the Hotel Defendants' "rack rates" – the Hotel Defendants' published rates for a room. The parity clause operates as a price floor or a minimum resale price

---

[2]     According to Priceline's 2012 Annual Report, "Gross bookings is an operating and statistical metric that captures the total dollar value, generally inclusive of taxes and fees, of all travel services booked by our customers, and is widely used in the travel business." 2012 Annual Report at 39.

maintenance agreement.  The most favored nation clauses insure that the OTA Defendants each have the same wholesale or net rate with the Hotel Defendants.

48.     The above is confirmed by the findings of the United States District Court for the Western District of Texas regarding the OTA Defendants' business models and pricing structures:

> After reviewing the record, it is clear that the [OTA] Defendants not only engage in a common course of conduct, but that many of their business practices are virtually identical.  These practices include but are not limited to the manner in which they contract with the Hotel Defendants, the manner in which they determine and assess cancellation policies and fees, the *manner in which they determine the mark up and fees to arrive at an acceptable margin and retail/sell rate*; and, the manner in which they calculate, assess and pay hotel occupancy taxes.  The deposition testimony of the corporate representatives, standing alone, reflects an amazing similarity in practice, procedure and corporate methodology among all of the [Online Retailer Defendants].

Memorandum and Opinion on Class Certification, *City of San Antonio v. Hotels.com, et al.*, No. SA-06- CA-381-0G (W.D. Tex) at 18-19 (emphasis added).

49.     The Court further determined, based upon deposition testimony:

> Almost without exception, the net rate and sell rate for a given room on a given day are the same among the [OTA Defendants] because the Defendants' agreements with the Hotel Defendants all contain "parity" or "Most Favored Nation" clauses.  This also makes the [OTA Defendants] margins the same.

*Id.* at 20, n.21 (citations to deposition testimony omitted).

50.     The Western District of Texas found the material terms of the contracts between the OTA Defendants and the Hotel Defendants have remained uncannily similar for numerous years and have not changed in any material way.  For example, the Court found that Defendant Travelocity (and its affiliates) have entered into only one new contract with a major national chain since 2004; the other contracts have simply been renewed.

51.     The OTA Defendants were able to structure their contracts with the Hotel Defendants in this fashion because, controlling nearly 50% of the online room reservations for

the leisure/unmanaged business travel market, they are viewed as an important distribution channel by the Hotel Defendants.

52.     The uniform adoption and enforcement of parity and most favored nation clauses in the contracts between the OTA Defendants and the Hotel Defendants can only be explained by a horizontal *per se* price fixing agreement between competitors.

53.     These agreements are and were part of a broader agreement to impose and enforce the scheme.  For example, in 2004, multiple hotels, including Defendants Hilton and Kimpton, and OTAs, including Defendant Priceline, gathered together in Las Vegas for EyeforTravel's Revenue Management and Pricing in Travel conference.[3]  At the conference, Defendants Hilton, Kimpton and Priceline, the supposed competitors, discussed "rate parity" and "pricing strategies," and other competitively sensitive topics.  Jimmy Shu, the VP Revenue Management and Distribution at Kimpton gave a presentation to "address the issues associated with adapting rate parity across all distribution channels . . . ."  EyeforTravel has annually sponsored these conferences, and the attendees have expanded to include nearly all of the Defendants.[4]

<u>The Hotel Defendants Enforced the Conspiracy Against Non-Defendant OTAs</u>

54.     The Hotel Defendants enforced the conspiracy on behalf of themselves and the OTA Defendants by requiring that any competing OTAs raise their retail prices to the Hotel Defendants' rack rates.  This prevented non-defendant OTAs from gaining market share from the OTA Defendants by the classic business practice of price cutting.  It also benefitted the Hotel Defendants by preventing non-defendant OTAs from competing against them on price.

55.     The Hotel Defendants had several mechanisms available to them to enforce the conspiracy.  First, they could refuse to allow competing OTAs to sell online room reservations if they did not adhere to the price floor agreement.  Second, they would threaten any competing

---

[3]     http://www.hotel-online.com/News/PR2004_2nd/May04_EyeForTravel (last accessed September 26, 2012).

[4]     http://events.eyefortravel.com/travel-distribution-summit-north-america/past-attendees.php (last accessed September 26, 2012).

OTAs with legal action. Third, the Hotel Defendants could threaten the wholesalers of their rooms to stop providing rooms to price-cutting OTAs.

56.     One OTA, Skoosh, has tried to compete and gain market share by price cutting. Seeing its efforts to grow its business through price competition thwarted by the Defendants' conspiracy, Skoosh publicly stated:

> "We were openly discounting and hotels would email, call and threaten legal action," Skoosh told the BBC.
>
> "Either we'd have to raise prices or take the hotels off our list," said Dorian Harris from Skoosh.[5]

57.     Skoosh has also stated that Defendants' conspiracy: "created a Mafia-style atmosphere and an intolerable climate for new businesses" and that "Skoosh has been directly threatened and, in turn, has defended its right to discount hotel prices."[6]

58.     Because Skoosh discounted below rack rates, Defendant Hilton required AlliedTPro, Skoosh's wholesale supplier of room reservation in the United States, to stop supplying Skoosh. AlliedTPro wrote to Skoosh: *"Trust me I would welcome the additional business but cannot risk our contracts with Hilton."*[7] As a result of Defendant Hilton's actions, Skoosh's accounts in the United States dwindled down from $4 million to nearly zero, demonstrating the power the Hotel Defendants could exercise to stop OTAs from competing against the conspiracy.

59.     On August 31, 2010, Skoosh's CEO sent a letter to OTA Defendant Booking.com. Skoosh detailed Booking.com's enforcement of the conspiracy against any Hotel Defendant who did not keep competing OTAs in line:

---

[5]     http://www.bbc.co.uk/news/business-11330463 (last accessed September 26, 2012).

[6]     http://www.tnooz.com/2012/07/311 news/ regulator-accuses-expedia-booking-com-and-InterContinental-in-hotel-competition-infringement-probe/ (last accessed September 26, 2012).

[7]     http://dorian.skoosh.com/open-letter-to-f-t-c-chairman-jon-leibowitz/ (last accessed September 26, 2012) (emphasis in original).

Both personally, and even as a direct competitor, I was always a fan of Booking.com.  Yours was one of the better hotel booking sites I always thought, with some innovative features.  However, my rosy picture fast disappeared last winter when Skoosh started being pursued by your business partners insisting that we raise our hotel prices to the same as yours.  I'm hoping you can find the time to address some of the points below and restore my faith in your company.

Some background then.  Earlier this year we started getting some calls from angry and confused hoteliers insisting that we were selling their rooms too cheaply.  I called them back to work out what was going on and they mostly told me that Booking.com had been on to them threatening all sorts of nonsense if they didn't either remove their hotels from Skoosh or force Skoosh to raise its prices.

I wondered how this was all happening so quickly and then I did a little research and found that Booking.com has an active policy of maintaining the same prices for all companies across the internet.  I even found a job ad of yours looking for 'Rate Parity Associates'.  It seems like you've got a whole team out there beavering away to 'find any rate inconsistencies between Booking.com and their competitors.'   They're doing a good job I have to say. The hoteliers you work with are certainly concerned.  One wrote to ask me to close out their hotel on Skoosh: 'just to avoid the penalty that [Booking.com] is threatening us about'.

Some were less friendly.  Many of the hoteliers wrote letters to me threatening legal action.  One of them had a colleague of yours on one line and me on the other.  It seemed that your colleague was insisting that if we hadn't removed their hotel from Skoosh by the end of the phone call Booking.com would cancel the contract with them.  They were very scared.[8]

---

[8]      http://dorian.skoosh.com/open-letter-to-kees-koolen-ceo-at-booking-com/ (last accessed September 26, 2012).

60.     Defendant Sabre (which also owns Defendant Travelocity) has a Rate Assured Hotel Program that requires the Hotel Defendants to enforce the conspiracy:[9]

For Suppliers

### Sabre Rate Assured™ Hotel Program

Are you *Rate Assured*?

*Sabre Travel Network* has already begun measuring properties to validate rate parity across properties prior to the official launch.  So make sure your properties are rate compliant!

 (b) If it is determined that a property is not providing rate parity in the program, it will essentially be placed on "Probation" status.
(c) If a property is not providing rate parity in the subsequent measurement, *Sabre* will consider the hotel "In Violation"…

61.     Sabre, which owns Travelocity, even runs a division called "Sabre Hospitality Solutions," which expressly markets and encourages hotels to adopt rate parity.[10]

62.     In an email communication, Defendant Trump admitted that it was enforcing the agreements that underlie the conspiracy:[11]

**From:** ███████████████████@███████
**Sent:** 10 May 2010 18:27
**To:** Dorian Harris
**Subject:** RE: New inquiry was submitted on Skoosh.com

The simple answer is; if we do not maintain parity with all, we are threatened with poor placement on sites and worst case… removal of hotel from sales sites. That is the way the OTA's operate in USA. Expedia threatens if Travelocity gets lower rate and vice-versa. It is a vicious cycle if we get out of parity.
I think the model in Europe is built to operate more competitively but that is not the model here. (Much as I wish it was the same as Europe!) I hope this helps you understand why we must be strict with what is offered on all websites.
Thanks,

████████████████████████████
Trump International ███████████

---

[9]     http://dorian.skoosh.com/open-letter-to-f-t-c-chairman-jon-leibowitz/     (last     accessed September 26, 2012).

[10]     *See, e.g.*, http://www.sabrehospitality.com/blog/2011-10-27/how-hotels-can-leverage-ota-relationships-without-killing-their-pricing-strategy;   http://www.sabrehospitality.com/blog/2011-11-30/three-top-trends-in-hospitality-marketing-and-distribution-to-consider-when-plruming-for-2012 (last accessed September 26, 2012).

[11]     http://dorian.skoosh.com/open-letter-to-f-t-c-chairman-jon-leibowitz/     (last     accessed September 26, 2012).

16

63.     Defendant InterContinental Hotels also enforced the conspiracy, writing to Skoosh "demanding that Skoosh either raise[] its rates to the same as the hotels and its other distribution partners (a practice known in the industry as 'rate parity') or remove the hotels entirely from our site."[12]

64.     In 2003, Defendant Marriott announced "a sweeping overhaul of its transient pricing, bringing parity to all Marriott distribution channels – offline and online."[13]  Like several of the other Hotel Defendants, Marriott threatened Skoosh.com with legal action and/or the withdrawal of their room reservations if Skoosh.com did not adhere to the conspiracy to adopt rate parity.

65.     Defendant Starwood admitted the importance of enforcing the conspiracy: "Should a wholesaler decide to sell the rooms on a room only basis, he has to make sure that the per contract agreed minimum mark-up is guaranteed."  The employee then admitted that those who do not adhere to the conspiracy are punished, stating that the "'violation' of Starwood's Best Rate Guarantee was 'really serious' and the breach was reported to the Brussels headquarters."[14]

66.     Kayak.com, a price comparison website, told Skoosh on several occasions that it had to "play the Orbitz game,"[15] i.e., adhere to the rules of the conspiracy, or else Kayak would no longer publish Skoosh's prices.  Kayak enforced the conspiracy on behalf of the OTA Defendants because the OTA Defendants account for a substantial percentage of its total revenues.  Orbitz and Expedia accounted for 18.8% and 24.9% of Kayak's total revenues for the

---

[12]     http://dorian.skoosh.com/open-letter-to-william-baer-arnold-porter-llp/     (referring     to Holiday Inn New York) (last accessed September 26, 2012).

[13]     http://www.businesstravelnews.com/More-News/Marriott-Revamps-Pricing--Offers-Complete-Parity,-Curtails-Fixed-Consortia-Rates/?a=btn (last accessed September 26, 2012).

[14]     http://www.telegraph.co.uk/finance/newsbysector/retailandconsumer/8461755/Hotels-face-inquiry-in-price-fixing-scandal.html (last accessed September 26, 2012).

[15]     http://dorian.skoosh.com/open-letter-to-steve-hafner-c-e-o-kayak-com/     (last     accessed September 26, 2012).

nine months ended September 30, 2010, respectively.[16]   After Skoosh reported the scheme to governmental authorities, Kayak removed Skoosh's prices from its website.

67.    Each of these actions was undertaken because of the pressure the OTA Defendants were placing on the Hotel Defendants to protect the OTA Defendants' margins by enforcing the conspiracy.   The primary method a non-OTA defendant can compete effectively with an OTA Defendant is by price cutting.   Enforcement of the conspiracy insures that OTAs cannot compete on a price basis, because they will have not the requisite inventory of hotel room reservations necessary to compete.

68.    The Hotel Defendants enforced the conspiracy so that they would not lose access to the OTA Defendants' websites.  An industry consultant explained:

> "I don't know that there's been enough public questioning of this [rate parity] practice," said Ashwin Kamlani, founder of Hotel Internet Help Inc., which helps independent hotels get more sales via cyberspace.
>
> *        *        *
>
> "The hotels enforce rate parity because they fear the consequences of not maintaining rate parity,' he said.   'They fear having their hotel dropped to page 6 or even pulled off their largest producing [online travel agents] sites, which translates into a potentially significant loss of revenue."[17]

69.    Blink Booking, a mobile-only hotel booking service, confirmed the claims of the competing OTAs, saying:   "We've long believed that the big online travel agents have been guilty of denying consumers the best prices – and that hotels' hands are tied by price parity agreements.  The online travel market may appear to offer plenty of choice and competition, but the reality is that there are lots of different shop windows selling the same rooms at the same

---

[16]      http://www.businessinsider.com/kayak-ipo-2010-11 (last accessed September 26, 2012).

[17]      Karen Robinson-Jacobs, "Practice that holds rates steady among hotels, travel sites coming under fire," *Dallas Morning News* (Nov. 16, 2010), reprinted at http://hsmaidfw.blogspot.com/ (last accessed September 26, 2012).

prices − with those prices agreed through parity deals between the big groups and the big OTAs."[18]

70.    The OTA Defendants refused to list hotels that would not adhere to the conspiracy.  For example, in 2009, Defendant Expedia denied Choice Hotels access to its various websites.  Expedia's CEO and President Dara Khosrowshahi explained:

> ". . . As far as the discussions that we've had with Choice, we are not doing business with Choice right now on a chain basis.  We don't have a vast majority of Choice hotels on our side," said Khosrowshahi . . . .

> . . . he added, "First of all, our primary goal is to have the broadest, deepest set and highest quality set of inventory for the benefit of our customers.  And this doesn't signal any kind of change in our overall philosophy as far as how we work with our hotel partners and what we're looking at.  It's not really an issue of economics; it's more than issue of our wanting rate parity and inventory parity for our customers."

> "When our customers come to Expedia, we want them to know that they're getting the best prices and certainly, we are insistent on that.  And to the extent that Choice doesn't want to work under those terms.  We won't be doing business with each other.  Those are the terms that we work with our others strategic partners, they're comfortable where they were comfortable with it.  So, its nothing usual from what I would say is typical practice for us in most of our other OTA competitors so to speak."[19]

71.    The OTA Defendants received agreements from the Hotel Defendants that they would only sell to OTAs who would not discount the rack rate for room reservations, even if it reduced the Hotel Defendants' sales and/or profits by reducing the overall sales of the online room reservations.

---

[18]    http://www.telegraph.co.uk/finance/newsbysector/retailandconsumer/leisure/9441235/OFT-alleges-InterContinental-Hotels-online-deals-broke-competition-law.html (last accessed September 26, 2012).

[19]    http://www.eyefortravel.com/distribution-strategies/expedia-stresses-rate-parity-and-inventory-parity-its-customers (last accessed September 26, 2012).

72.     The OTA Defendants sought and obtained the agreement of the Hotel Defendants to impose and enforce "rate parity" – *i.e.*, restrain price competition -solely for the Defendants' benefit and not for any legitimate pro-competitive reason.

73.     The OTA Defendants are incentivized to maintain their product and profit margins, as their margins are threatened by newer and more efficient OTA competitors.  It is not surprising, then, that dominant firms, like the OTA Defendants, would react anti-competitively to threats to their pricing freedom, such as those posed by new or more efficient OTAs.

<u>The Conspiracy Has Resulted in "Rate Parity"</u>

74.     The conspiracy has achieved an anticompetitive market where the OTA Defendants do not compete on the basis of price for room reservations.  The OTA Defendants only sell online room reservations at or above the artificially inflated rack rate.

75.     Deposition testimony of Tim Gordon, Senior Vice President, of Priceline demonstrates that each of the OTA Defendants buy the rooms and sell the rooms to Plaintiffs and the Class at exactly the same price:

> Q.     And in fact, sir, lets take a look at ALL22.  And this is a printout I did back in September for a night's stay at the Hilton in San Antonio ... $219 rate, taxes and then a total.  And then if you will look through, I've printed out from the various websites of the defendants, same hotel, same night.  Orbitz has its $219.00 rate. Cheap Tickets has its $219.00 rate.  Lowest Fare has a $219.00 rate.  Priceline, $219.00 rate.  Travel Now, $219.00.  Expedia, $219.00.  And Hotels.com, $219.00.  Every website lists this room on this night at the • exact same room rate.  And you know – you know, based upon the way the contracts work, that doesn't surprise you, does it?
>
> A.     No.
>
> Q.     And why doesn't that surprise you?
>
> A.     Because in general – and I can't be too specific because I don't know the exact terms of this agreement, but in general the contracts require us to take a net rate that they provide and mark it up by a specific amount.  And they require us to mark it up by that amount.
>
> Q.     By that exact amount?
>
> A.     Yes.

Q.      And your understanding  is that you have best price guarantee from Hilton where they can offer your competitors more heavy discounts than they can offer Priceline, correct?

A.      That is true.

* * *

Q.      All right.  And so given the Most Favored Nations Clause that Hilton has, your understanding would be everybody – all these competitors are being provided this room at the same price and marking it up by the same amount resulting in the same retail rate, correct?

A.      I believe that to be true.

76.     The price fixing is also demonstrated on the OTA Defendants' websites:

Hilton San Diego Bayfront (Hilton)
Bridge View 2 Queens, October 5-7, 2012 (viewed 9/26/2012)

| | |
|---|---|
| Expedia.com | $185 |
| Hotels.com | $185 |
| Priceline.com | $185 |
| Booking.com | $185 |
| Orbitz.com | $185 |
| Travelocity.com | $185 |
| Hilton.com | $185 |

Courtyard by Marriot New Orleans Convention Center – (Marriot)
2 Queen, November 6-8, 2012 (viewed on 9/26/2012)

| | |
|---|---|
| Expedia.com | $199 |
| Hotels.com | $199 |
| Priceline.com | $199 |
| Booking.com | $199 |
| Orbitz.com | $199 |
| Travelocity.com | $199 |
| Marriot.com | $199 |

Four Points by Sheraton Miami Beach – (Starwood)
Standard Double, November 20-22, 2012 (viewed on 9/26/2012)

| | |
|---|---|
| Expedia.com | $159 |
| Hotels.com | $159 |
| Priceline.com | $159 |
| Booking.com | $159 |
| Orbitz.com | $159 |
| Travelocity.com | $159 |
| starwoodhotels.com | $159 |

Sir Francis Drake, a Kimpton Hotel (Kimpton)
Historic Queen Room, October 29-31, 2012 (viewed on 9/26/2012)

| | |
|---|---|
| Expedia.com | $329 |
| Hotels.com | $329 |
| Priceline.com | $329 |
| Booking.com | $329 |
| Orbitz.com | $329 |
| Travelocity.com | $329 |
| Sirfrancisdrake.com | $329 |

Grand Hyatt Atlanta (Hyatt)
1 king bed, November 16-18, 2012 (viewed on 9/26/2012)

| | |
|---|---|
| Expedia.com | $97 |
| Hotels.com | $97 |
| Priceline.com | $97 |
| Booking.com | $97 |
| Orbitz.com | $97 |

| | |
|---|---|
| Travelocity.com | $98 |
| Grandatlanta.hyatt.com | $97 |

Trump Soho New York
November 2-4, 2012 (viewed on 9/26/2012)

| | |
|---|---|
| Expedia.com | $565 |
| Hotels.com | $565 |
| Priceline.com | $565 |
| Booking.com | $565 |
| Orbitz.com | $565 |
| Travelocity.com | $565 |
| Trumphotelcollection.com | $565 |

Wyndham Atlanta Galleria
December 7-9, 2012 (Viewed on 9/26/2012)

| | |
|---|---|
| Expedia.com | $199 |
| Hotels.com | $199 |
| Priceline.com | $199 |
| Orbitz.com | $201 |
| Travelocity.com | $199 |
| wyndham.com | $199 |

Ramada Limited San Francisco (Wyndham)
December 7-9, 2012 (Viewed on 9/26/2012)

| | |
|---|---|
| Expedia.com | $160.65 |
| Hotels.com | $160.65 |
| Priceline.com | $160.65 |
| Orbitz.com | $160.66 |

| | |
|---|---|
| Travelocity.com | $160.66 |
| Ramada.com | $160.65 |

Crown Plaza Hotel St. Louis - Downtown (Intercontinental)
Standard Room, October 12-14, 2012 (viewed on 9/26/2012)

| | |
|---|---|
| Expedia.com | $123.12 |
| Hotels.com | $123.13 |
| Priceline.com | $123.13 |
| Orbitz.com | $123.12 |
| Travelocity.com | $123.13 |
| Ichotelsgroup.com | $123.12 |

77.     The rate parity demonstrated above results from the conspiracy.  Moreover, the OTA Defendants employ "market managers" who "monitor closely a hotel's rates across all channels, and if a preferential rate was given to one over the other that hotel could face dire penalties."[20]  The Hotel Defendants started to experiment with price discounting by offering a "tiered pricing" system but the OTA Defendants demanded that the Hotel Defendants stop competing with OTAs on price.

<u>The OTA Defendants Have Additional Ties to Help Facilitate the Conspiracy</u>

78.     Certain of the OTA Defendants have entered into separate agreements with each other that help facilitate the conspiracy.

79.     Defendant Orbitz and Defendant Priceline have a long-standing marketing agreement with each other related to Travelweb (a Priceline affiliate).  In 2002, Travelweb entered into an agreement with Oribtz to provide Orbitz with an exclusive inventory of hotel rooms from Defendants Hilton, Hyatt, InterContinental, Marriot, and Starwood, that Orbitz could

---

[20]     Jason Q. Freed, "*Does rate parity limit revenue managers?*" http://www.hotelnewsnow.com/articles.aspx/8459/Does-rate-parity-limit-revenue-managers June 25, 2012 (last accessed September 26, 2012).

sell using its merchant model.  In 2004, Priceline completed its acquisition of Travelweb.  On June 30, 2005, Priceline and Orbitz announced a modified marketing agreement whereby Priceline would become Orbitz's exclusive provider of "opaque" travel services.  In an opaque travel service, such as Priceline's "Name Your Own Price" service, the customer agrees to purchase a hotel room at a set price without knowing the identity of the actual hotel.  In exchange, Priceline modified Orbitz's ability to negotiate directly with Defendants Hilton, Hyatt, InterContinental, Marriot, and Starwood for hotel inventory.

80.    The interconnectivity between these OTA Defendants helps facilitate the conspiracy by providing disincentives to competition in that Orbitz and Priceline would be faced with competing against each other while at the same they were in partnership on marketing opaque travel services and other hotel inventory.

The OTA Defendants' Low Price Guarantees<br>Simply Reflect the Effectiveness of the Conspiracy

81.    Because they have all entered into identical contracts with parity and most favored nation clauses, the OTA Defendants know that each of them will list the exact same price for the exact same room.  Thus, they are each are able to offer a nearly identical "best price" guarantee.

82.    Absent the conspiracy, the OTA Defendants would have to legitimately compete on price, discounting from the rack rate, to be able to offer the best price guarantees.

INVESTIGATION BY BRITISH AUTHORITIES

83.    Defendants' price-fixing conspiracy is the subject of a formal investigation by the British Office of Fair Trade ("OFT").  The OFT issued a "Statement of Objections" based on provisional findings that Expedia, Inc., Booking.com B.V., and International, infringed on competition by using the very same price fixing agreements alleged herein for hotel rooms in Great Britain.  The *Telegraph* reported Expedia admitted "it has engaged in cartel conduct on breach of the law," and is "providing information on its rivals under a 'leniency deal'" with the

British authorities.  After initially limited its investigation to a small number of OTAs and hotels, the OFT has announced that it is likely to expand its investigation throughout the industry.

ANTITRUST INJURY AND DAMAGES

84.    Defendants' unlawful conspiracy has impacted Plaintiffs and the Class.  Prices paid by the Plaintiffs and the Class to the Defendants and their co-conspirators were unlawfully fixed at supra-competitive levels in the United States, such that Plaintiff and the Class paid more for online room reservations that they would have but for Defendants' conspiracy.  As a result of Defendants' conspiracy, competition in the sale of online room reservations was unreasonably restrained.  Furthermore, as a result of Defendants' conspiracy, Plaintiffs and the Class have been and continue to be injured in their respective business and property in amounts to be determined at trial.

CLASS ACTION ALLEGATIONS

85.    Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following class (the "Class"):

> From January 1, 2004 to the present, all persons in the United States who purchased directly from any Defendant an online room reservation for a Hotel Defendant's room. Expressly excluded (i) room reservations made as part of a package deal or (ii) room reservations made without disclosure of the name of the hotel until after paying for the room reservation.

86.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants and their co-conspirators.

87.    Defendants and their co-conspirators have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief.

88.    Plaintiffs believe that while there are thousands of members of the Class as described above, their exact number and identities are ascertainable from records that are currently in possession of the Defendants.

89.     The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.

90.     There are questions of law and fact common to the Class, which relate to the existence of the conspiracies alleged, and the type of common pattern of injury sustained as a result thereof.  These common questions of law and fact predominate over any questions solely affecting individual members of the Class.  Questions of law and fact common to Class members include, but are not limited to:

a.      whether Defendants engaged in agreements, contracts, combinations, and conspiracies, which had the purpose and/or effect of unreasonably restraining competition and limiting purchaser access to competing and lower-priced  room reservations that were purchased by Plaintiffs and the Class;

b.      the identity of the participants in the conspiracies;

c.      the duration of the conspiracies alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracies;

d.      whether the alleged conspiracy violated §1 of the Sherman Act, 15 U.S.C. §1;

e.      whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to Plaintiffs and other members of the Class;

f.      whether Defendants' unlawful conduct caused Plaintiffs and other Class members to pay more for the room reservations than they otherwise would have paid;

g.      the appropriate measure of damages sustained by Plaintiffs and other members of the Class;

h.      the appropriate injunctive relief; and

i.      whether, and in what amount, Plaintiffs and the other Class members are entitled to recover treble damages, Court costs, and attorneys' fees.

91.     The Plaintiffs' claims are typical of the claims of the other Class members, and Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs purchased hotel room reservations at the Defendant Hotels through the Defendant OTAs and their interests are coincident with and not antagonistic to those of the other members of the Class.  In addition, Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

92.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

93.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and is one for which records should exist in the files of Defendants and their co-conspirators.  Prosecution as a class action will also eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual actions would engender.  Treatment of this case as a class action will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  Absent a class action, Defendants will retain substantial funds received as a result of their wrongdoing, and such unlawful and improper conduct shall, in large measure, go unremedied.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

### TOLLING OF THE STATUTE OF LIMITATIONS, FRAUDULENT CONCEALMENT, EQUITABLE TOLLING AND CONTINUING VIOLATIONS

94.     Throughout the period of the conspiracy alleged herein, Defendants and their co-conspirators fraudulently concealed their unlawful activity from the Plaintiffs and other members of the Class.  Plaintiffs and the Class were unable to detect this secret conspiratorial activity, described more fully herein, which by its nature is self-concealing.  Furthermore, as supported by

the facts alleged herein, Defendants and their co-conspirators acted fraudulently and deceptively to conceal the unlawful collusion, by *inter alia*:

a.      falsely representing to the Plaintiffs and members of the Class that prices paid for hotel room reservations were fair and competitive, when, in fact, Defendants had concealed from Plaintiff and the Class their unlawful collective conduct wherein they combined to form and maintain resale price maintenance agreements;

b.      falsely representing to the Plaintiffs and other members of the Class that prices paid for hotel room reservations were fair and competitive, when in fact, the pricing was set through the conspiratorial activity alleged herein; and

c.      advertising to the Plaintiffs and other members of the Class to create the false impression of independent or unilateral conduct, when in fact, Defendants and their co-conspirators had agreed to fix prices.   Advertisements creating the false impression of independent conduct include:

i.      Travelocity's Best Price Guarantee:   Travelocity's website advertises that it can "guarantee the best price."  If a consumer can find a lower price online, Travelocity won't just match that price, it will "give you $50 off your next trip." Travelocity's advertised guarantee is the "Most Comprehensive Guarantee in the Industry."

ii.     Expedia's Best Price Guarantee:  Expedia's website advertises that Expedia "is so confident you'll find the best price for your trip here on Expedia that we guarantee it.   Find a cheaper trip within 24 hours of booking and we'll refund the difference – and give you a travel coupon worth $50."  Expedia's Best Price Guarantee covers hotel room reservations.

iii.    Orbitz's Price Assurance:   Orbitz's website advertises that customers get the lowest price or else they will get back 110%.  The website represents that if a customer books a "prepaid hotel room on Orbitz and we immediately start tracking to see if another customer books the same itinerary at a lower price."  "If another

Orbitz customer books your same itinerary for less, we'll issue credits – or Orbucks – for 110% of the difference."

        iv.     Priceline's Big Deal Guarantee:  Priceline's website advertises that "*If You Find* a Lower Published-Price for your Reservation, *Priceline Will:* 1) Match the lower price; 2) Give YOU $25; 3) Send you a $50 Vacation Package Coupon for your next trip."

95.    Any applicable statutes of limitation have been tolled by Defendants' affirmative acts of fraudulent concealment and continuing misrepresentations, as the facts alleged above reveal.

96.    Defendants continue to engage in the deceptive practice, and consequently, unwary consumers are injured on a daily basis by Defendants' unlawful conduct.  Therefore, Plaintiffs and the Class submit that each instance that Defendants engaged in the conduct complained of herein and each instance that a member of the Class purchased a room reservation constitutes part of a continuing violation and operates to toll the statute of limitations in this action.

97.    By reason of the foregoing, the claims of the Plaintiffs and the Class are timely within any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment.

<u>FIRST CLAIM FOR RELIEF</u>

Violation of 15 U.S.C. Section 1

98.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

99.    The agreements, and their enforcement, constitute contracts, combinations and conspiracies that substantially, unreasonably, and unduly restrain trade in the relevant market(s), and harmed Plaintiffs and the Class thereby.

100.    The agreements cover a sufficiently substantial percentage of relevant market(s) to harm competition.

101.    The Defendants are liable for the creation, maintenance, and enforcement of the Agreements under a per se, "quick look" and/or rule of reason standard.

102.    Defendants possess market power.

103.    The agreements harm competition by artificially raising and stabilizing prices.

104.    There is no legitimate, pro-competitive business justification for the agreements or any of them that outweighs their harmful effect.   Even if there were some conceivable justification, the agreements are broader than necessary to achieve such a purpose.

105.    Plaintiffs and members of the Class were injured in their business or property by the collusion and conspiracy alleged above which facilitated, enabled, assisted or furthered Defendants' substantial foreclosure and exclusion of competition in the relevant market(s).

106.    But for Defendants' unlawful agreement and conduct, Plaintiffs and the Class paid higher prices for online room reservations than they would have absent Defendants' conspiracy.

<u>RELIEF REQUESTED</u>

Plaintiffs, on their own behalf and on behalf of the Class, respectfully request judgment, as follows:

A.      For an Order certifying this case as a class action against Defendants and appointing the Plaintiffs as Representatives of the Class;

B.      For money damages against Defendants and in favor of Plaintiffs and the Class on all claims asserted in this Complaint;

C.      For costs of suit incurred herein;

D.      For prejudgment interest to the extent allowed by law;

E.      For penalties as allowed by law;

F.      For permanent injunctive relief to enjoin further violations of the law; and

G.      For such other and further relief as this Court may deem just and proper.

<u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury on all issues triable of right by jury.


DATED:  September 26, 2012                    SCOTT+SCOTT LLP


                                              /s/ David R. Scott
                                              David R. Scott
                                              Joseph P. Guglielmo
                                              156 South Main Street
                                              P.O. Box 192
                                              Colchester, CT 06415
                                              Telephone: (860) 537-5537
                                              Facsimile:  (860) 537-4432
                                              drscott@scott-scott.com
                                              jguglielmo@scott-scott.com


                                              Christopher M. Burke
                                              Walter W. Noss
                                              John T. Jasnoch
                                              707 Broadway Suite 1000
                                              San Diego, CA 92101
                                              Telephone: (619) 233-4565
                                              Facsimile  (619) 233-0508
                                              cburke@scott-scott.com
                                              wnoss@scott-scott.com
                                              jjasnoch@scott-scott.com

                                              Greg Davis
                                              DAVIS & TALIAFERRO, LLC
                                              7031 Halcyon Park Drive
                                              Montgomery, AL, 36117
                                              Telephone: (334) 832-9080

                                              *Counsel for Plaintiffs and the Proposed Class*